UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| GEORGE C. L.,[1] | Case No.  20-cv-08232-RMI |
| Plaintiff, | |
| v. | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| ANDREW SAUL, | Re: Dkt. Nos. 18, 21 |
| Defendant. | |

Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for benefits under Titles II and XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 7 & 9), and both parties have moved for summary judgment (dkts. 18 & 21). For the reasons stated below, Plaintiff's motion for summary judgment is granted, Defendant's motion is denied, and the case is remanded for the immediate calculation and award of benefits.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On February 23, 2017, Plaintiff filed applications for benefits under Titles II and XVI, alleging an onset date of January 1, 2015. *See* Administrative Record "AR" at 24.[2] As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on October 1, 2019. *Id*. at 10-22. The Appeals Council denied Plaintiff's request for review on January 29, 2020. *See id*. at 12-17. Thereafter, on November 23, 2020, Plaintiff sought review in this court (dkt. 1) and argued that the ALJ failed to articulate specific and legitimate reasons for rejecting the opinion of Plaintiff's treating psychologist – which, when credited as true established Plaintiff's disability. *See generally* Pl.'s Mot. (dkt. 18) at 5-10.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff – who is now 43 years old – has been diagnosed with a number of serious physical and mental impairments. *See* AR at 382. In addition to having suffered a broken back (anterior fracture of the lumbar spine at L1), Plaintiff is afflicted with compression deformity and lumbar radiculopathy (also at L1), anxiety disorder, bipolar disorder (Type 1), posttraumatic stress

---

[2] The AR, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #16. *See* (dkts. 16-1 through 16-9).

United States District Court
Northern District of California

1   disorder ("PTSD"), panic disorder, major depressive disorder, shizoaffective bipolar mania, and

2   total hearing loss in one ear (causing attendant balance problems). *See id*. at 27, 382. Plaintiff's

3   treating psychologist, Lea D. Queen, Psy.D., rendered an opinion about Plaintiff's ability to

4   function in the workplace which the ALJ gave "little weight because it is overly restrictive." *See*

5   *id*. at 34. The ALJ also gave little weight to the testimonial statements provided by Plaintiff's wife

6   because, *inter alia*, "she [did not] establish that she is familiar with Social Security Regulations

7   and disability determination criteria." *Id*. at 35. The ALJ similarly rejected Plaintiff's "statements

8   about the intensity, persistence, and limiting effects of this symptoms, [because] they are

9   inconsistent with the objective medical evidence." *Id*. at 31. Accordingly, the following is a

10  statement of the evidence relevant to the ALJ's determinations in those regards.

11      *Function Reports*

12      On March 16, 2017, Plaintiff and his wife completed and submitted function reports that

13  described (from each of their perspectives) Plaintiff's abilities and limitations. *See id*. at 317-25,

14  342-49. The picture that emerges upon review of both of these reports is one where Plaintiff's

15  conditions combine to render him heavily dependent on his wife in nearly every aspect of daily

16  life. At the outset, Plaintiff described the mental conditions that limit his ability to work as:

17  "apprehension, second guessing, anxious, nervousness, unsure, hesitant to speak / react, [and]

18  voices." *Id*. at 317. As to the inclusion of "voices," among his list of problems – Plaintiff later

19  described this as referring to auditory hallucinations – "I hearing things that I think are my

20  conscious pushing me to do things." *Id*. at 323. In response to being asked what sorts of things he

21  was able to do previously that his illnesses now preclude, Plaintiff wrote that he was formerly able

22  to: "conversate (sic), have a social life, hear and not be unbalanced, not be afraid of being sick or

23  freaking out, having friends, working, and being happy." *Id*. at 318. In response to a question

24  about how his illnesses affect his ability to effect personal care, Plaintiff responded that he is

25  nearly entirely dependent on his wife for everything from getting dressed to using the restroom –

26  in this regard, Plaintiff opened a window into the despair that marks his experience: "I can't even

27  move and I wish it was over!" *Id*. As to his dependence on his wife, Plaintiff noted as follows

28  throughout his function report: "wife brings me food, [and] forces me to eat"; "my wife reminds

United States District Court
Northern District of California

me to take pills, eat, shower, [and] change"; "my wife oversees this, I have seven medications"; "wife makes me get activity"; Plaintiff only goes shopping "with wife for food"; Plaintiff spends his time with "just wife at our mobile trailer"; otherwise Plaintiff only goes to church and doctors' appointments, for which he needs his the assistance of his wife; and, "don't talk to no one but my wife." *Id.* at 318-22. In short, Plaintiff noted that he is limited – both physically and mentally – because, to put it in his words: "I have a broken back, deaf in one ear, equilibrium problems, schizoaffective [disorder], bipolar [disorder], anxiety, depression, PTSD," and as such his life is limited to "church on Sundays to pray to be healed," and time spent in doctors' offices." *Id.* at 321-22. He summed up the depth of his despondency by stating: "[s]ince the onset of my 12-19-14 back injury and the drastic decline of my mental health – not to mention the complete loss of hearing in my right ear, (equilibrium) my entire world has been shattered, I went from being in the prime of my life to being but a shell of the man I use[d] to be, my life is ruined and if I'm not approved for SSDI/SSI I will lose my trailer too, I am on the verge of complete and utter destruction, I have nothing except this." *Id.* at 324.

On the same date – March 16, 2017 – Plaintiff's wife also completed and submitted a third-party function report. *See id.* at 342-49. She noted that Plaintiff suffers from night terrors that are related to his PTSD and that he also experiences "significant mood swings [that] make [adhering to] daily routines difficult." *Id.* at 343. She added that Plaintiff is no longer capable of feeding or caring for himself due to his inability to focus or concentrate, in addition to his physical limitations and his "unwillingness due to [his] depression." *Id.* at 344. She also stated that these conditions also combine to preclude his ability to handle bank accounts, or even to use a checkbook or money orders because he is chronically forgetful, confused, and also because his behavior is often governed by his compulsions. *Id.* at 345. She then opined that his physical and mental impairments affect his abilities in every conceivable domain of work-related functioning. *See id.* 347. Plaintiff's wife then concluded by noting that interacting with authority figures such as bosses, landlords, and police triggers Plaintiff's anxiety and PTSD, and that his stress and frustration tolerance is so poor in that it causes him to experience auditory hallucinations, in that "[h]e hears things that aren't there." *Id.* at 348. In short, Plaintiff's wife noted that when they first

4

United States District Court
Northern District of California

1    met, they "went out and did things outdoors," but that since the onset of his impairments, her

2    relationship to him had come to resemble more of a caretaker than anything else. *Id*. at 346.

3            *Hearing Testimony*

4            Nearly two years later, on January 31, 2019, the ALJ convened a hearing at which Plaintiff

5    appeared (alone) to testify. *See id*. at 45-79. The hearing commenced with the ALJ asking

6    Plaintiff, "[s]o what kind of place are you living at right now?" *Id*. at 47. Plaintiff responded,

7    "[w]ell, unfortunately, ma'am, I'm homeless right now . . . me and my wife separated[,] [s]he took

8    all the cars, so I have to walk to school . . . the disability resources at Santa Rosa Junior College

9    has a program that they help, try to get us, you know, to take some classes and stuff, and it's pretty

10   good for me, because it keeps me busy." *Id*. at 48. When asked for the number of classes for which

11   he was registered, Plaintiff responded with the following lengthy narrative: "[w]ell, I signed up for

12   four classes - - but I think I'm going to be able to do two classes, because the other ones, they're

13   introduction, but they're really hard, and like, I don't understand them very well . . . [o]ne of them

14   is beginning - - I have this right here. Beginning operating systems or beginning, like, to use, like

15   Windows and stuff like that . . . [a]nd the other - - and then the other one is, like, how to - - like,

16   Windows has, like, a shell program I think it's called, like, how to use the other part of Windows,

17   like the command lines and stuff like that . . . [a]nd that was pretty difficult for me, because there's

18   a lot of remembering long words and stuff." *Id*. at 48-49.

19           When the ALJ asked Plaintiff to describe the difficulties he experienced with his last job in

20   a sales capacity, Plaintiff stated, "[i]t's - - I don't know - - it's awkward to talk to people, I have - -

21   one of my problems is anxiety, so I  - - sometimes, I could do it, but, like, if it's, like, the wrong

22   time of day or something or I don't know what it is, but, like, my skin will tingle, you know, my

23   skin will tingle, and I can't really function, I mean, I have to wait for the attack to subside." *Id*. at

24   54. When asked to describe what prevents him from working, Plaintiff stated, "[w]ell, I have a  - -

25   I've been diagnosed with PTSD, it's - - I mean, I have depression and stuff like that, and you

26   know, I definitely gave it my best shot to work, but the PTSD, like, is, like, developed in my head

27   or whatever they call it, like, it's pretty debilitating at times, even with the medicine, you know?

28   And I just - - I'll have night terrors, and I just - - I'm - - I just . . . [t]he hardest thing for me to do

                                                    5

is communicate . . . I get real stressed out and the depression and everything kicks in, I hear voices. My official diagnosis is schizo bipolar something disorder or something like that, and when I go into a mania or a low, then that's when I hear the confusion." *Id*. at 58-59. In response to a question about indications of methamphetamine use in his medical records, Plaintiff explained, "I have taken it on several occasions when I tried to kill myself." *Id*. at 61. When asked to elaborate on when his last suicide attempt took place, Plaintiff related, "[j]ust a little while ago, when my wife left. I came out of Walmart, and she was gone, she took my RV and everything I owned and . . . she just left me standing in the parking lot." *Id*. When asked if he has done anything like that since, Plaintiff explained "[n]o, that didn't work, so I tried another way [and] [t]hat didn't work either and they put me in a crisis stabilization unit." *Id*. at 61-62.

Plaintiff was then asked to describe his auditory hallucinations; he responded to the following effect, "[w]ell, they vary, but I mean, right now, I think my wife is just trying to tell me it'll be okay, I'll make it through this." *Id*. at 62. When asked if there are other voices, Plaintiff broke down and simply responded, "I miss my wife." *Id*. After Plaintiff was given some time to collect himself, the ALJ asked him again whether or not he ever hears any other voices, to which Plaintiff answered, "[o]ne of my daughters . . . I hear my daughter that I did it a day before or whatever." *Id*. at 62-63. Lastly, the ALJ asked Plaintiff to explain whether or not things are better or worse for him since he stopped using drugs and alcohol – Plaintiff explained: "I know this won't make sense to anybody, ma'am, but it – I don't - - I never - - I don't  - - I'm not a big drug user. I mean, I  - that's not my - - I like alcohol, and I mean, I've used drugs before, but just because I know that they're - - and that's what I wanted. I mean, I - - so I mean, yeah, I haven't - - I'm not using drugs, but my life was - - it's  - - I mean, it hasn't really been any worse ever. I mean, it's - - I'm very - - I'm very scared all the time and alone, and I hear my wife talking to me, but she's not there, and I just don't get what's going on. And . . ." *Id*. at 70. With that, the ALJ interrupted and stated, "Okay. All right. I think that's all the questions that I have for now." *Id*.

Upon the completion of Plaintiff's testimony, the ALJ questioned a vocational expert ("VE") by posing a series of hypothetical questions. *See id*. at 71-79. In pertinent part, the VE testified that if someone were to be off-task or non-productive for 20% of the workday, such a

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    person would be unable to secure or maintain any form of competitive employment. *Id*. at 77-78.

2        *Medical Evidence*

3        From May of 2015 to December of 2016, Plaintiff underwent intensive psychiatric

4    treatment under the care of Neil Ehrlich, M.D., on behalf of the Behavioral Health Division of the

5    Sonoma County Department of Health Services. *See id*. at 487-529. A review of Dr. Ehrlich's

6    treatment notes reveals the picture of a deeply distressed individual. For example, on various

7    occasions, Dr. Ehrlich noted: "[h]e feels lethargic, blank, and 'stupid'"; "[h]e is afraid that he will

8    get kicked out of [the] Mary Isaacs [homeless shelter]"; "symptoms worsening"; "[h]e had a very

9    hard time in jail and has been dealing with overwhelming episodes of anxiety . . . the anxiety is so

10   severe sometimes that he feels it in his joints and has taken to obsessively cracking his knuckles

11   trying to relieve it"; "severe anxiety . . . [h]e is 'very tense' and feels like he is 'jumping out of

12   [his] skin'"; reporting in May of 2015 that Plaintiff "[j]ust got out of A Turning Point [shelter] and

13   [is] now at Sam Jones Shelter, he and his wife plan to get back together and get a place in a few

14   months, but she is hesitant and wants to see if he is using again"; "[h]e got into an argument with

15   his wife and began driving recklessly, ultimately getting into a high speed chase with the police,

16   hiding, and turning himself in several days later"; "[w]hen manic, he is 'arrogant' [and]

17   excessively social, and exhibits poor judgment and decision-making, when depressed, he feels that

18   he is 'in a lull' and obsesses, constantly seeking reassurance from and check[ing] in with his

19   wife"; Plaintiff started using alcohol when he was 11, "becoming a full blown alcoholic at 14."

20   *See e.g. id.* at 487, 489, 497, 501, 502.

21       Thereafter, Plaintiff underwent an extensive course of psychotherapy under the care of Lea

22   D. Queen, Psy.D., at frequent and regular intervals between April of 2017 and March of 2018. *See*

23   *id*. at 614-729. During numerous treatment sessions, Dr. Queen repeatedly diagnosed Plaintiff

24   with bipolar disorder, depression, anxiety disorder, PTSD, and schizoaffective disorder. *See e.g.*

25   *id*. at 701, 711. Dr. Queen cataloged Plaintiff's extensive list of psychological symptoms from his

26   major depressive disorder, his anxiety disorder, his PTSD, his bipolar disorder, and his

27   schizoaffective disorder as including the frequent exhibition of depression, anxiety, various

28   delusions, psychotic symptoms (such as auditory hallucinations), mania, hypomania, as well as

7

obsessive and compulsive behaviors. *See id*. at 701, 707. As to Plaintiff's tendency to obsess, Dr. Queen noted on one occasion that Plaintiff "related some of his experiences in prison and how terrified he is that he'll be railroaded into returning and . . . that he is often obsessed with doing everything right in order to avoid further brushes with the law." *Id*. at 697. On another occasion, in January of 2018, Dr. Queen noted that Plaintiff "related some of his experiences in early life, and it became clear that his early life contributes to his PTSD, for which he's never had treatment." *See id*. at 692. Unsurprisingly, the administering of a depression / anxiety screening (conducted in October of 2018) revealed that Plaintiff was almost always afflicted with nearly every single indicator of severe depression (e.g., little interest or pleasure in doing things, feeling down or hopeless nearly every day, having little energy, thoughts that he would be better off dead, and thoughts about hurting himself, etc.). *See id*. at 667-68.

Midway through the course of Plaintiff's psychotherapy, Dr. Queen completed and submitted a detailed questionnaire setting forth her opinions about Plaintiff's ability to function in the workplace. *See id*. at 614-618. She noted at the outset that Plaintiff's principal psychological diagnosis is for bipolar disorder, while assessing a global assessment of functioning ("GAF") score of 42. *Id*. at 614. She then listed the pertinent signs and symptoms as follows: blunt, flat or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent disturbances in moor or affect; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions which are a source of marked distress; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); intense and unstable interpersonal relationships and impulsive and damaging behavior; perceptual or thinking disturbances; hallucinations or delusions; motor tension, emotional lability; deeply ingrained maladaptive patterns of behavior; illogical thinking; vigilance and scanning; pathologically inappropriate suspiciousness or hostility; pressures of speech; sleep disturbance; and, involvement in activities that have a high probability of painful

consequences which are not recognized. *See id.* at 615.[3]

Dr. Queen then found marked limitations in Plaintiff's abilities as to the following domains, such that he "cannot satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting" (as to unskilled work): sustain an ordinary routing without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; or, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. *Id.* at 616. In the following domains (also related to unskilled work), Dr. Queen found extreme limitations ("no useful ability to function" at all): ask simple questions or request assistance; accept instructions and respond appropriately to criticism form supervisors; or, deal with normal work stress. *Id.* As to skilled and semi-skilled work, Dr. Queen found a marked limitation (unable to meet competitive standards) in Plaintiff's ability to deal with stress and an extreme limitation (total inability to function) in his ability to set realistic goals or make plans independently of others. *Id.* at 617. Dr. Queen also found marked limitations in Plaintiff's ability to interact appropriately with the public, as well as in the ability to maintain socially appropriate behavior. *Id.* At bottom, Dr. Queen found that Plaintiff can be expected to have good days and bad days, but that under any circumstance, he would likely be absent from work for more than 3 days per month. *Id.* at 618. She also opined that his impairments can be expected to last longer than 12 months; that his impairments are reasonably consistent with the symptoms and functional limitations that she had outlined; and, that alcohol and substance abuse have not contributed to any of Plaintiff's limitations. *Id.*

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or

---

[3] As discussed *infra*, this list of signs and symptoms (combined with Dr. Queen's other findings) render Plaintiff clearly disabled under the relevant listings for depressive disorder and bipolar disorder.

more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[4] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ set forth the applicable law under the required five-step sequential evaluation process. *See* AR at 25-26. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date on which the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ in this case found that (for Title II purposes) Plaintiff met the insured status requirements of the Social Security Act through June 30, 2021, and that he had not engaged in substantial gainful activity since January 1, 2015, the alleged onset date. *See* AR at 26-27. At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the following severe impairments: compression deformity of L1; degenerative disc disease; hearing loss; bipolar disorder; anxiety disorder; and polysubstance abuse. *See* AR at 27-28. However, the ALJ made no mention of Plaintiff's major depressive disorder or his PTSD at Step Two, nor it does not appear that these conditions were either mentioned or considered elsewhere in the opinion. *See id*. at 27-37.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

---

[4] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless it is necessary to note otherwise.

United States District Court
Northern District of California

burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *See* AR at 28-30. Next, the ALJ determined that Plaintiff retained the RFC to perform light work with certain limitations including that he would be limited to performing simple routine tasks with only occasional interaction with coworkers, supervisors, and the public. *See id*. at 30-35.

At Step Four, the ALJ determined that Plaintiff is unable to perform his past relevant work. *Id*. at 35-36. Lastly, at Step Five, based on the RFC as formulated, and the testimony of the VE, the ALJ found that Plaintiff can still perform the functions of certain jobs that exist in significant numbers in the national economy such as collator operator, photocopy machine operator, and routing clerk. *See id*. at 36-37. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time prior between the alleged onset date, January 1, 2015, and the date of the ALJ's decision, March 21, 2019. *Id*. at 37.

## DISCUSSION

As discussed below, the court finds that the ALJ improperly rejected the testimony and statements of Plaintiff and his wife. The ALJ also improperly rejected the opinions of Plaintiff's treating psychologist (Dr. Lea Queen). The upshot of these errors is that the ALJ formulated an incorrect RFC, on the basis of which the ALJ rendered an incorrect non-disability finding. Because the rejected evidence is supported by the overwhelming tide of the record evidence, and because the ALJ improperly rejected it, the court will credit that evidence as true. Further, once credited as true, the combination of that testimony and medical opinion evidence establishes that Plaintiff is clearly disabled; accordingly, as set forth below, the court will remand this case to the Commissioner for the immediate calculation and award of appropriate benefits.

The ALJ rejected Plaintiff's statements through the use of a frequently-used and abundantly familiar piece of boilerplate to the following effect: "[a]s for the claimant's statements

about the intensity, persistence and limiting effects of his symptoms, they are inconsistent with the objective medical evidence. *See id*. at 31. However, the ALJ did not specify which parts of Plaintiff's testimony were supposedly inconsistent with which parts of the record. *See id*. at 27-35. With the exception of that boilerplate, the ALJ's only other explanation as to why some or all of Plaintiff's testimony was supposedly "inconsistent" with the objective medical evidence was presented in the following four statements: (1) "the claimant did positively respond to his medications"; (2) "the claimant was able to transition from jail to [a] homeless shelter and ride public transportation, reflecting an ability to adapt"; (3) "despite a history of suicidal thoughts and attempts, the claimant [otherwise] exhibited fair to good judgment and good insight and was future oriented"; (4) Plaintiff was "regularly cooperative during appointments." *See id*. at 30, 33.

An ALJ must provide specific, clear, and convincing reasons to reject a claimant's symptom testimony. *Smolen v. Chater*, 80 F.3d 1273, 1280 (9th Cr. 1996). Valid reasons to reject Plaintiff testimony might include prior inconsistent statements, evidence of effective treatment that lessens the degree or severity of symptoms that were the subject of that testimony, and allegations that are inconsistent with activities of daily living. *See e.g. Ghanim v. Colvin*, 763 F.3d, 1154, 1163 (9th Cir. 2014) (inconsistent statements); *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (effective treatment); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (activities of daily living). First, the ALJ's reasons were non-specific in that the ALJ did not explain which parts of Plaintiff's testimony were being rejected, nor did the ALJ explain which parts of Plaintiff's testimony were supposedly inconsistent with which parts of the record. Second, the ALJ's reasoning was unclear and unconvincing because it was patently incorrect. While Plaintiff may have (at times) reported positive effects from some of his medications, it cannot be reasonably suggested that this equated to a lessening of the symptoms of his mental health impairments such as to lessen the degree of the attendant limitations. Also, being released from jail to a homeless shelter and then riding a bus does not show a sufficient degree of adaptability as to cast any doubt on any quantum of Plaintiff's testimony about his inability to work due to the symptoms associated with his bipolar disorder, anxiety, major depressive disorder, PTSD, and schizoaffective disorder. Third, it is most unconvincing that reliance should be placed on the notion that Plaintiff, on two occasions, was

described by an intake nurse as exhibiting "fair to good judgment." It should also go without saying that living in a homeless shelter and sitting in a bus does to mean that Plaintiff can function in the workplace. Similarly, being uncooperative during medical appointments is not the *sine qua non* of being unable to function in the employment setting.

In short, the ALJ's rejection of Plaintiff's statements was not based on substantial evidence because the overwhelming body of the relevant record evidence supports and bolsters Plaintiff's testimony. Given that the ALJ improperly rejected Plaintiff's statements, the court will now credit those statements as true as a matter of law. *See e.g.*, *Christopher E. v. Comm'r of SSA*, No. 6:18-cv-00824-MK, 2019 U.S. Dist. LEXIS 132507, at *26 (D. Or. Aug. 7, 2019) ("The ALJ's statement is conclusory, and his analysis provides no specific, clear and convincing reasons based on substantial evidence. For this reason alone, Plaintiff's testimony is credited as true."); *see also Abraham A. v. Saul*, No. 19-cv-04350-RMI, 2021 U.S. Dist. LEXIS 47072, at *20 (N.D. Cal. Mar. 11, 2021) (same).

The ALJ also improperly rejected the statements of Plaintiff's wife. *See* AR at 35. In this regard, the ALJ only explained that Plaintiff's wife "did not provide specific functional limitations, nor did she establish that she is familiar with Social Security Regulations and disability determination criteria." *See* AR at 35. It is well established that in determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. *See Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *see also* 20 C.F.R. §§ 404.1513(a)(4) ("Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim. We may receive evidence from nonmedical sources either directly from the nonmedical source or indirectly, such as from forms we receive and our administrative records."), & 416.913(a) (same). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted). Although eyewitnesses may sometimes have to rely, to some extent, on communications with the claimant in ascertaining whether he or she is disabled or malingering, the Court of Appeals for the Ninth Circuit has held that friends and family members have a

United States District Court
Northern District of California

valuable perspective in observing a claimant's symptoms and daily activities and are therefore eminently competent to testify as to a claimant's condition. *See e.g. Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). "Disregard of this evidence violates the Secretary's [own] regulation that he [or she] will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Id*. (citing what was then codified at 20 C.F.R. § 404.1513(e)(2)). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he [or she] must give reasons that are germane to each witness." *Dodrill*, 12 F.3d at 919; see also *Lewis v. Apfel*, 236 F.3d 503, 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.").

First, it should not go without mention that the ALJ's reasoning as to why Plaintiff's wife's statements were rejected flies in the face of the Agency's own regulations. Second, if the ALJ were correct, and only witnesses who "establish that [they] [are] familiar with Social Security Regulations and the disability determination criteria" would be competent witnesses, then no claimant (or close friend or relative) could offer such evidence unless they happened to also be a claims adjuster or ALJ at the Social Security Administration. In any event, Plaintiff's wife was not venturing to present expert opinions, medical findings, or testimony about "disability determination criteria," instead she was merely reporting her own observations of Plaintiff's limitations. The unquestionable value of this type of lay testimony, particularly when it comes from a member of a claimant's household, is well established. *See e.g. Smolen*, 80 F.3d at 1289. The ALJ erred by discounting Plaintiff's wife's statements simply because she did not "establish a familiarity with Social Security Regulations," as that explanation has no basis in the law, or in the Agency's regulatory scheme. Therefore, the court finds that the ALJ failed to provide legally sound reasons for rejecting Plaintiff's wife's statements in that the ALJ's explanation was the product of legal error, let alone not being germane to Plaintiff's wife. *See e.g. Eggerud v. Astrue*, 2008 U.S. Dist. LEXIS 84386, 2008 WL 4682651, *8 (E.D. Wash. Oct. 21, 2008) (holding that the ALJ could not discount lay witness testimony merely because the witness was "not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs

United States District Court
Northern District of California

and symptoms, or of the frequency or intensity of unusual moods or mannerisms"); *Williams v. Astrue*, 2009 U.S. Dist. LEXIS 34528, 2009 WL 1110312, \*10 (E.D. Cal. April 23, 2009) (same); *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (finding that a lay person, plaintiff's wife, "though not a vocational or medical expert, was not disqualified from rendering an opinion as to how her husband's condition affects his ability to perform basic work activities") (citing 20 C.F.R. § 404.1513(d)(4)) (providing that evidence provided by lay witnesses may be used to show "the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work")); and *McCutcheon v. Astrue*, 378 Fed. Appx. 649, 651 (9th Cir. 2010) (finding that the ALJ erred by rejecting lay witness testimony on the basis that the witness had no medical or vocational training) (citing *Bruce*, 557 F.3d at 115-116). Accordingly, because the ALJ improperly rejected Plaintiff's wife's statements, those statements will now be credited as true as a matter of law. *See Robinson v. Colvin*, No. 3:10-cv-05572-KLS, 2013 U.S. Dist. LEXIS 127610, at \*29 (W.D. Wash. Sep. 6, 2013) ("Where lay witness evidence is improperly rejected, that testimony may be credited as a matter of law.").

As to the opinions of Plaintiff's treating psychologist – Dr. Lea Queen – the ALJ credited her opinion that Plaintiff is unable to perform skilled or semi-skilled work, however, the ALJ rejected the entirety of the remainder of her opinions. *See* AR at 34. Here, the ALJ's explanation was exceptionally terse: ". . . the remainder of Dr. Queen's opinion [is given] little weight because it is overly restrictive." *Id*. Instead, the ALJ formulated the RFC by giving "partial weight" to the opinions of two state agency non-examining consultants, as bolstered by certain isolated nuggets from the record to which the ALJ assigned undue weight – such as the fact that Plaintiff's relegation to a homeless shelter upon being released from jail, as well as the fact that he once rode a bus, demonstrated his adaptability. *See id*.

It is now axiomatic that "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995); *see also Revels v. Berryhill*, 874 F.3d 648, 654-55 (9th Cir. 2017); *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also*

*Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). Furthermore, the ALJ's reliance on certain isolated snippets from the record (e.g., living at a shelter or sitting in a bus), all of which were removed from their context, constitutes an unpersuasive effort to discredit Plaintiff's treating psychologist.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). In situations where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

It is not necessary to determine whether or not Dr. Queen's findings and opinions were "contradicted" by the opinions of the non-examining state agency consultants because the ALJ's explanation for rejecting Dr. Queen's well-founded opinions did not even rise to the level of specific and legitimate reasons supported by substantial evidence given that, in light of the record as a whole (as described in detail above), it cannot be reasonably said that the outlier, and incomplete, opinions of the non-examining state agency consultants (as embodied by the RFC as formulated as modified by the ALJ), in combination or individually, constitute "substantial evidence." To put it another way, in light of the evidentiary record, the conclusory and unsupported opinions by the non-examining consultants (as largely adopted by the ALJ and embodied in the RFC) are incapable, in and of themselves, of being characterized as "such

1    relevant evidence as a reasonable mind might accept as adequate to support a conclusion" to the

2    effect that Plaintiff's mental health conditions are attended with so few limitations as are found in

3    the RFC described above. *See Biestek*, 139 S. Ct. at 1154.

4         In short, calling Dr. Queen's opinions "overly restrictive" is neither specific, nor

5    legitimate, nor is it based on substantial evidence. Dr. Queen's opinions were bolstered and

6    corroborated by the treatment notes rendered by Dr. Ehrlich (Plaintiff's previous treating

7    psychiatrist), by Plaintiff's wife's statements, and by Plaintiff's own testimony. Indeed, even

8    putting aside the *substance* of Plaintiff's testimony – the very *form* of that testimony even

9    confirmed and corroborated each of the limitations opined by Dr. Queen. As stated above, the

10   evidentiary picture presented by this case is one of a person who cannot take care of himself, who

11   has a seriously damaged psyche, and who operates at the very edge (if even that) of his ability to

12   cope. Therefore, because the ALJ improperly rejected Dr. Queen's opinions, those opinions will

13   now be credited as true as a matter of law. *See e.g. Lester*, 81 F.3d at 834 (stating the general rule

14   that the improperly discredited opinion of a treating or examining physician is credited as true as a

15   matter of law).

16                                    **Nature of Remand**

17        The decision whether to remand for further proceedings or for payment of benefits

18   generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

19   1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

20   been fully developed and where further administrative proceedings would serve no useful

21   purpose." *Smolen*, 80 F.3d at 1292. The Court of Appeals for the Ninth Circuit has established a

22   three-part test "for determining when evidence should be credited and an immediate award of

23   benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an

24   immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally

25   sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be

26   resolved before a determination of disability can be made; and, (3) it is clear from the record that

27   the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The

28   second and third prongs of the test often merge into a single question; that is, whether the ALJ

United States District Court
Northern District of California

17

1    would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2;

2    *see also Garrison v. Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of

3    the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to

4    seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of

5    benefits is required). Here, in light of the above-discussed and improperly discredited lay-witness

6    account, as well as Plaintiff's own statements, and the medical opinion evidence, it is clear that

7    Plaintiff has in fact been disabled since at least his alleged onset date, and it is equally clear that

8    further administrative proceedings would serve no useful purpose because the ALJ would be

9    required to find Plaintiff disabled for a whole host of reasons on remand.

10         Plaintiff's major depressive disorder, his anxiety disorder, his PTSD, and his bipolar

11   disorder – each – would undoubtedly compel independent disability findings at Step Three

12   because they each clearly meet, or at least medically equal, the severity of the criteria for the

13   relevant listings. However, for present purposes, it is only necessary to undertake the Step Three

14   analysis for one or two such disorders; to wit: under Listing 12.04(A)(1) (depressive disorder), and

15   12.04(A)(2) (bipolar disorder). *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.04. Therefore, the first

16   reason that further administrative proceedings would be useless is that based on the improperly

17   discredited evidence, Plaintiff's depression clearly meets the criteria of Listing 12.04(A)(1). In

18   order to satisfy the pertinent criteria of Listing 12.04 regarding either depression or bipolar

19   disorder, it is necessary to satisfy the requisite number of criteria listed in Subpart (A) and (B), or

20   (A) and (C). *See id*.

21         For depression, Subpart (A)(1) requires medical documentation of a depressive disorder,

22   characterized by five or more of the following: depressed mood; diminished interest in almost all

23   activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor

24   agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty

25   concentrating or thinking; or thoughts of death or suicide. § 12.04(A)(1). As set forth above,

26   between his statements, his wife's statements, and those of his treating physicians, Plaintiff meets

27   *all* of the Subpart A(1) criteria for depression. *See* AR at 47-70 (Plaintiff's hearing testimony); *see*

28   *also id*. at 317-29 (Plaintiff's Function Report); *see also id*. at 342-49 (Third Party Function

Report); *see also id*. at 683-727, 614-19 (Dr. Queen's treatment notes and Mental RFC) (finding Plaintiff to be afflicted with virtually all of these indicia). Furthermore, as set forth above, the evidence of record also reflects that Plaintiff meets at least five (if not six) of the Subpart (A)(2) criteria relating to his bipolar disorder, where it is only necessary to satisfy as little as three of the criteria. *See id*. at 683-727, 614-19 (Dr. Queen's treatment notes and Mental RFC). Additionally, when the improperly discredited evidence is given effect, Plaintiff clearly meets or equals the severity of all of the four categories outlined in Subpart B (where only one must be satisfied as to an extreme limitation, or two as to marked limitations) in that Dr. Queen opined extreme limitations in three categories of work-related functioning and marked limitations in another five categories. *See id*. at 616-17. Further, although it would be totally unnecessary, the improperly discredited evidence – when given proper effect – also satisfies the dual requirements of Subpart (C) as to both depression and bipolar disorder in that the record reflects that Plaintiff's various physical impairments combine to collectively worsen the effects of each of his mental impairments (*see id*. at 617 – Dr. Queen opined that Plaintiff's physical impairments worsen his mental impairments) – indeed, the record (as set forth above) clearly manifests "a medically documented history of the existence of [several] disorder[s] over a period of at least 2 years, and there is evidence of both medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder; and, marginal adjustment, that is, [Plaintiff] has [a] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." *Compare* 20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.04, *with* AR at 614-19, 667-727. Accordingly, the court finds that based on the evidence herein credited as true, Plaintiff's major depressive disorder and his bipolar disorder are both clearly disabling at Step Three.

For these same reasons, once this improperly rejected evidence is given effect, the ALJ would also be required to find that Plaintiff is disabled during the RFC formulation phase because he clearly has no residual capacity to function in the workplace at all. Moreover, the VE testified that if someone were to be off-task more than 20% of the time, such a person would be unable to secure or maintain any form of competitive employment. *Id*. at 77-78. In this regard, combining

United States District Court
Northern District of California

1   Dr. Queen's opinions that Plaintiff's psychological symptoms would cause him to be absent from

2   work more than 3 days per month (*id*. at 618), with her opinion that he has no ability to function <u>*at*</u>

3   <u>*all*</u> in dealing with normal work stress, in asking simple questions or requesting assistance, or in

4   accepting instructions and responding appropriately to criticism from supervisors (*id*. at 616) – not

5   to mention the several categories in which she opined marked limitations – it would necessarily

6   follow that Plaintiff would be off-task (even in an unskilled job) for considerably more than 20%

7   of the time. Indeed, he would likely be off-task for the overwhelming majority of each and every

8   workday. Accordingly, on remand, the ALJ would also be required to find Plaintiff disabled at

9   Step Five based on the testimony of the VE because Plaintiff's conditions would cause him to be

10  off-task or absent nearly all of the time.

11      At this juncture, the court will note that in cases where each of the credit-as-true factors is

12  met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a

13  "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing

14  *Garrison*, 759 F.3d at 1021). This is certainly not one of those "rare instances," as the evidentiary

15  record leaves no room for any doubt that Plaintiff has in fact been disabled, at least since his

16  alleged onset date, if not much earlier. Needlessly remanding a disability claim for further

17  unnecessary proceedings would only delay much needed income for claimants such as Plaintiff

18  who are unable to work and who are entitled to benefits; doing so would in turn subject them to

19  "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on

20  remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). The

21  court is satisfied that the ALJ's unsupported conclusions were thoroughly negated by the

22  overwhelming weight of the record evidence which conclusively and convincingly establishes

23  Plaintiff's disability such that no further inquiry is necessary.

24  //

25  //

26  //

27  //

28  //

United States District Court
Northern District of California

**CONCLUSION**

As described above, Plaintiff's summary judgment motion (dkt. 18) is **GRANTED**, Defendant's summary judgment motion (dkt. 21) is **DENIED**, the ALJ's non-disability finding is **REVERSED** and the case is **REMANDED** for the immediate calculation and award of appropriate benefits.

**IT IS SO ORDERED.**

Dated: March 21, 2022

ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California